oral argument 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants. Counsel, I'm going to mess up your last name. How do you pronounce it? Wotanowicz. Mr. Wotanowicz for the plaintiff appellants. Good morning, may it please the court. My name is Garth Wotanowicz on behalf of plaintiffs. I would like to reserve three minutes for rebuttal. And I'd like to start today just addressing, I think, the elephant in the room. The court has requested additional briefing and received briefing on the decision in the Fenner v. General Motors case. And I want to make clear what plaintiff's position are with respect to that case. We believe that that case factually is indistinguishable and that good or bad, essentially, we are stuck with it unless. And it's probably no surprise to the court that one side is trying to embrace the parts of the case they like and the other side is trying to embrace the other parts. Well, we think that the holding with respect to preemption is factually indistinguishable. It's on all fours with this case. And that should in this court, this panel should follow that decision here. With respect to the RICO holding, the second part of that case, we, again, we think that it's factually indistinguishable. But we believe that the court failed to consider three cases that we think under state versus United States in this circuit presents either controlling or at least Supreme Court authority that provides directly applicable legal reasoning that should have been considered by the panel in Fenner but wasn't and calls for a different outcome here. So if the court agrees with us that those are either controlling or provide directly applicable reasoning, then we think it should go another way. If not, if you disagree with us on that, then we concede we're stuck with the RICO holding. There's nothing to distinguish these two cases on the facts. So addressing the preemption portion of the ruling, you know, we find it interesting that when the defendants were seeking to have this case dismissed on their motion for judgment on the pleadings, they found the Fenner decision, the lower court's Fenner decision, directly applicable. They weren't distinguishing on the facts there. Now that it's sort of flipped around on them, they're looking for ways to distinguish them. Are you doing the same thing, just in reverse? Not factually, Your Honor. I mean, we think that the legal reasoning continues to be applicable to the case. So, you know, we have this interesting case. We have this rule in our circuit that one panel can't overrule a prior panel. And it's left to a future panel to decide whether another panel overruled a different panel sometimes. So we have Ford and we have Fenner. And so Ford is the original case. So we have to decide whether that case controls this case. Fenner says it doesn't control. And your case is a lot like Fenner. So Fenner says that Ford doesn't control. But we have to decide whether Fenner was correct that Ford doesn't control. Is that right? Yes. It's just an odd circumstance sometimes we get in. I think that's accurate, Your Honor. I would say, though, that with respect to Ford, it deals with an entirely different statute. So I think that the idea that a preemption analysis under a completely different statute could control a later preemption analysis under an entirely different statute, I don't think that that follows, that Ford necessarily would control, given that they're different statutes. I appreciate there are some differences. We can get into those. But just conceptually sort of what we're doing here, because two of our colleagues said Ford doesn't control, but Judge Kethledge in dissent thought that Ford did control or that the Fenner case was a lot like Ford. Would it be better for our full court to resolve this? Or is it better for this panel to resolve this issue? I'm just curious what your take is on that, because we're going to have to make the call which one we think controls. That's never a comfortable position to be in, because we're just judging as opposed to doing this collectively. But there's issues with doing things collectively, too. So I'm just curious about your thought about whether we should be doing this as a full court or whether it should be this panel. I think that this panel can and should decide this case based on the facts in front of it and based on the analysis that was provided in both Fenner and Ford. Because, you know, I think that there's an argument that Ford should control, but if you look at Fenner, it actually applied Ford. It just didn't reach the same conclusion. The analysis applied by the majority in Fenner went through the exact same steps and examined the same factors as Ford. They just reached a different conclusion based on the facts in front of them in Fenner. And those facts we submit are essentially the same as the facts that you're going to find in this case. Judge Kethledge would disagree with that. I mean, he was in the minority in that case. We have a lot of judges now, nine judges, who will get a chance to opine on all this. But we can talk about the difference. I just was just curious sort of, you know, if you were sitting here, you had these different precedents, what you thought the best approach would be to straighten them out. Well, I do think it's unfortunate that we have three cases. I mean, there's a separate case, another case before this court at the same time that sort of went on. Is that being argued this sitting? Pardon me? Is that being argued this sitting? There is not an oral argument in that case, Your Honor. The panel waived oral argument and will decide it on the papers. Paper that hasn't come out yet? No, it has not, Your Honor. And as far as I know, the decision on the en banc rehearing petition in Fenner, unless it came out while I was sitting in this courtroom, that has not been decided to my knowledge. I'll check it then. But with respect to Fenner Perhaps that's a good way to frame it. If that were en banc, you would still make the same arguments, if Fenner were en banc, you would still make the same arguments that you're distinguishable from Ford? Yes, Your Honor. And your argument would not be altered by the loss of Fenner, because you would make those claims as you would like to have argued them, perhaps a little bit adversely to the decision in Fenner. Is that correct? Yes, I think that's right, Your Honor. I mean, if the court were to consider Fenner en banc and were to go the completely opposite direction as Fenner, then I think I have to concede that would definitely impact this panel's ability to rule differently. And, you know, whether this case could be considered, if it were taken up en banc, whether it could be considered at the same time by the full panel, I don't know. That might be the most efficient way to do it. Or at the very least, I would think that this panel would want to await the guidance from the full court before it issued a decision. You know, I'm not going to say that this case, I don't think this case is distinguishable enough from Fenner to be able to survive a different outcome if the full court were to do something different there. So if we put the RICO claim aside then, how would you divide the preempted versus not preempted claims? The preempted claims are consistent with really the same five types of claims that were made in Fenner. We have claims that involve violations of the federal statute or the federal standards. We had claims that relate to fraud on the regulators, and we are conceding that those under Fenner are not allowed. And that's not part of the case that we think would go forward. But we also assert the other three types of claims that were permitted in Fenner, and that is fraud based on violations of reasonable consumer expectations. And defendants want to point to specific statements by plaintiffs in the case about their subjective expectations and where they got those expectations from. But I would point out the court in Fenner was talking about a reasonable person standard. This is not a subjective standard for every single plaintiff. This is a reasonable person standard. Isn't a reasonable person's expectations going to be influenced by federal standards? I don't know anything about emissions, but if the EPA says something, that might inform my view as a consumer about what I should expect from the performance of my vehicle. Well, I think that it depends on the context. In this case, we have defendants who are marketing their vehicles as ultra-clean diesel vehicles. And there are other statements in the record about how they touted both the fuel efficiency and the cleanliness of these vehicles. And I think that a jury can decide, and they're equipped to decide, what a reasonable person would expect in light of the statements that were made and the statements that were not made. But what about if one reasonable expectation for consumers is what does the EPA say on this, what are the EPA standards, and has this truck met those standards? Is there a jury after Ford, or how do we parse that out? Our position is that the claim itself would not depend on the violation of the federal standard. The fact that there might be some reference to a federal standard as a benchmark that doesn't have any legal implications I don't think should be foreclosed by either Ford or by Fenner, because the thing that's being violated is the consumer's expectation. The fact that in referring to a consumer expectation, the federal standards might be referred to or might be a relevant way to talk about the thing, I don't think renders it completely preempted. I don't know why preemption would be. Based exclusively on the federal standard, you'd agree it's preempted? Yes. But if it's part, if that's one of the considerations, it's okay. It's just a fine line. I don't know if this is a jury instruction or the jury's instruction, they can't consider any federal standards, but there's just some, I think when you say consumer expectation, that just sweeps in a lot of things, and it might sweep in some things that Ford said would be preempted as the basis for the claim. I think that what I would suggest to illustrate that would simply be that if the violation of the standard itself, just by showing that, if that's enough to render the defendants liable, then we would concede preemption. In this case, with respect to consumer expectation, that expectation could be below or above the standard. They could say that these vehicles were so clean that a reasonable consumer would expect them to be well below the federal standards, and so they could be potentially under that standard held liable, even if they didn't exceed the federal standard. And I don't know why the reference to a federal standard in that context would implicate preemption principles, because it's not using... For express, does that make a difference, whether it's categorized as implicit? Well, sure. In this case, the only allegation is implied preemption, and so it's a higher standard, and there is no allegation of express preemption in the field of consumer protection, in this case or really in any other. I've only got about a minute left. I would just like to touch briefly on the RICO issue, if I may. And that is simply that we think that the trio of cases, Onza, Bridge, and Hemme, from the Supreme Court, they present a directly applicable legal standard when it comes to RICO cases. Now, in Fenner, it seemed that they felt obligated to follow precedent in this circuit that stems from antitrust cases. And the problem there is that the Supreme Court in these three cases has provided guidance about standing when it comes to RICO cases, and that's different, because the Illinois BRIC principle that there's a bright line rule that bars indirect purchasers in antitrust cases is based on a specific set of policy implications. Those aren't necessarily present in a RICO case. And we think in this case, considering those three decisions, Fenner should have been decided differently, and this court should follow the Supreme Court precedent. And I'll reserve my remaining time. Good morning, Your Honors. May it please the Court. Stephen Dunwant for FCA U.S. in this matter. First, I'll start by addressing FCA U.S.'s position with respect to a question that was asked by Your Honors, of my opposing counsel here, and that is the importance of what I believe is the importance of the full court weighing in on this issue, because as has been acknowledged, we have potentially four decisions out here that could go different ways. We have the Ford decision, which came first. We have the Fenner decision. We have your colleagues that have taken the Counts case under submission, and then we have this case. And I do believe for the auto industry, for my client in particular, that it is important to have clear direction on the issue of preemption as it relates to compliance with, in this case, EPA standards, but in other cases, many other regulations and standards that apply to manufacturers in the automobile industry. But turning to this case... Are there any other pending cases in the district court on these issues? Your Honor, not to my knowledge, and I know that we put in an amicus brief in the Fenner case, and we did look, and I don't think that we came up with any other that are currently pending that have these same types of issues. But over the years, there have been other reoccurring issues, oftentimes with FMVSS regulations, things like that, where similar issues do arise, but we just happen to have right now this trio of cases with respect to EPA regulations and then the Ford case with respect to related fuel economy regulations. I want to spend some time talking about a world in which, if the Fenner decision stands, in which an affirmance in this case is still the correct result under Ford. Now, Your Honor, the majority opinion in Fenner turned on a finding that there was a disconnect between the claims based on exceeding EPA standards and defrauding the EPA, and other claims that were based on GM's advertisement. The majority of that panel found that the claims relating to the EPA standards were preempted, whereas the other claims based on GM's advertisements were not. In other words, the panel found that the advertisement-based claims were unconnected to the EPA standards, and they expressly said they found that those claims existed independently of the EPA standards. And one example that that panel, the majority of that panel provided, was that GM had advertised that these trucks got 63% better emissions than previous models. We have nothing like that in this case. There is no disconnect between the claimed advertisements that FCAUS and Cummins supposedly put out there to the public and the EPA standards, because the only claimed advertisements that plaintiffs have put at issue here are about clean diesel, clean emissions. And I'll get to why that's important, because plaintiffs made a very particular admission in their complaint in this case, and that is the EPA decides whether or not these vehicles are clean. So you can't have a claim that is based on a false advertisement of clean emissions that's unconnected to the EPA regulations when plaintiffs admit that it's those EPA regulations that determine and designate whether these vehicles are clean. So that makes this very different than the Ford cases, Your Honor. And in fact, I would suggest that it's impossible to read the complaint in this case and imagine what claims would exist but for the allegations that FCAUS and Cummins misled the EPA and manufactured vehicles that exceeded EPA standards. In our supplemental briefing, Your Honors, we pointed this out. The very definition of the vehicles at issue in this complaint, which plaintiffs call polluting vehicles, they're defined as vehicles that exceed the EPA's NOx emission standards. And all of the accusations of wrongdoing, Your Honors, the allegations of how the trucks were defective and the testing that went into showing how those trucks were defective are all entirely dependent and connected to the EPA's NOx emission standards. And if those allegations are out of this complaint as preempted, as even the Fenner majority said they should be, this complaint would make no sense, Your Honors. If you were to read this complaint separate and apart from the allegations that FCAUS and Cummins violated emission standards, there would be no allegations of wrongdoing because the only allegations, even under Fenner, that might stand of wrongdoing would relate to statements about clean diesel and whether or not they were false. So effectively, your argument is even making an independent argument about misrepresentations that were made to the public about what these vehicles would do or about what might amount to a fraudulent claim. All of those go away because the testing itself is the only bar against which you measure that. Can't consumers measure against a different bar? Well, Your Honor, the way these claims are pleaded are the bar, the consumer expectation that they say is that these are clean. Well, the EPA decides whether or not they're clean, Your Honor, and so for plaintiffs to then try to go forward and prove falsicity, to prove that our statement is false, they would have to essentially prove that we either defrauded the regulators or that the regulators got it wrong that our vehicles were certified as meeting the clean diesel emission standards promulgated by the EPA. So your core argument is because of those tests, there is nothing left, right? There cannot be a separate claim. Well, because there is no allegations that we created any expectation. There is a possible scenario. Advertisements, statements to consumers, none of that matters because the EPA actually does its own testing and has its own procedures? Well, Your Honor, I'm not saying it would never matter, but in this case it doesn't matter because the advertisements that are issued relate directly to the EPA's work and the certificate of compliance for these vehicles. When the EPA certified these vehicles as clean diesel vehicles, then you cannot have, it's our position, an advertising claim that is somehow based on advertising a vehicle as clean diesel. Now, have these vehicles been advertised? You can advertise anything you want to say about the vehicle's cleanliness or the way it functions, the way the entire thing works as far as the environmental impact. None of that, because there is a test separate, none of that can ever state a separate claim. Your Honor, I'm not asking the court to go that far. I'm struggling to find your dividing line. So if, for example, a vehicle manufacturer were to advertise these vehicles get X NOx emissions and plaintiffs can show that the vehicles do not get X, but they get somehow some higher Y emissions, that would stand separate and apart from the EPA standards and the certificate of conformity that the EPA issued for these vehicles being clean diesel vehicles. Isn't there a presumption against implied preemption? Your Honor, that was dealt with in both Ford and Fenner. I believe the Ford analysis got it correct as it relates to these types of claims. And I would ask your Honors that if you look at Ford and apply the, and not apply the presumption as they did in Ford, that that would be the correct result here. Thank you, Tom. Yes, thank you, Your Honors. May it please the court, Jeff Sobel on behalf of co-defendant Cummins, Inc. And I want to start with that very important fact that I represent Cummins, Inc., which is not the manufacturer of the vehicles. Cummins, Inc. is the manufacturer and seller of the engines. That gets directly to the question that was just happening. Cummins, Inc. has not made one advertisement to the public about these vehicles. There are no advertisements over which Cummins, Inc. could be sued outside of a fraud on the agency theory. In fact, the allegation of Cummins' representation was made in investor documents, and that allegation establishes how this case is distinguishable from Fenner and like Ford because it is a fraud on the agency allegation. In the third amended complaint, paragraph 137, it is alleged by the plaintiffs that in 2007, FCA and Cummins produced the cleanest heavy-duty diesel pickup in the market by meeting EPA 2010 emissions. That's the statement that was attributed to Cummins from their investor documents, by meeting EPA 2010 emissions. So first of all, that statement is we met the regulations. Second of all, that statement is about model year 2007. There are no statements from Cummins publicly anywhere about model year 2008, 2009, et cetera. So there can be no reliance by any reasonable consumer on any representation by Ford, excuse me, by Cummins, which makes this like the Ford case and not the Fenner case. Moreover, I know that this is a fraud on the agency claim from the plaintiffs because I've read the original complaint, the second amended complaint, and the third amended complaint, all of which allege this is fraud on the agency. In fact, the complaint started as a defeat device case until plaintiffs' experts had to admit that there were no defeat devices in the vehicles. So paragraph 6 of the third amended complaint says that illegal software created defeat devices and a fraud on the agency. They went on. Paragraph 299, the emission fraud enterprise whose purpose was to deceive regulators. That's the allegation. Paragraph 300, the emission fraud enterprise was formed for purpose of obtaining EPA certificate of conformity. It's all about deceiving the regulators. We actually have the benefit in this case. We've been through fact discovery. We've been through expert discovery. And I realize it's not the standard at issue on the preemption, but if we were to be sent back down following Fenner, there is no allegation of reasonable consumer expectations and there is no testimony of reasonable consumer expectations. The expert testimony from plaintiffs, from Mr. Smithers, who's also cited in the dissent in Fenner, Mr. Smithers says these vehicles exceed the emissions regulations and that's why they have, quote, excessive emissions device, a phrase he made up for this case after he concluded that everything that he opined on had been disclosed by Cummins to the regulators who then approved them. So here we would have, apparently, an expert witness who would testify that everything that he thinks is wrong with the engines that results in excessive emissions, they were all disclosed to the regulators. The regulators all reviewed them. The regulators approved them over and over and over again. But the emissions are more than the regulatory standard, which is the only comparison that their expert made. And because it's more than the regulatory standard, there should be a liability. So there is no allegation in the case about reasonable consumers. In fact, the plaintiffs themselves testified that they expected to meet regulations or that they had no expectations on emissions and they were all over the map. Nobody testified as to any representation from Cummins, right? And that leads into what exactly is my client supposed to do? We don't have advertisements. We don't make representations. We don't have dealers. The dealers are FCA US dealers. We have no connection with them. We don't even know who the buyers of the vehicles are. We have no way to communicate with them. Further, what should we provide them? The information given to the regulators, one AECD document tends to be 300 to 500 pages long, and nobody can understand it without talking to engineers from Cummins. Every single model year ends up with multiple AECD documents because they are updated routinely, and they're trade secrets. We don't even share them with our business partner, FCA. The only party that sees them are the regulators. And those are the documents on which plaintiff's case is built. The calibrations in the control modules, which were the original focus of this case before they had to admit that everything was disclosed and there were no defeat devices, those are only disclosed to the regulators. They're not shared. In this case, all of that information was produced in a locked-down laptop with all the ports turned off under the strictest protective order available. So what are we supposed to give consumers? It's still about a record site as to whether Cummins actually made public press releases. My notes, I do not have the papers with it, but my notes are that it was record 255-14, 255-15, and complaint exhibits 13 and 14. Can you correct me or explain it? So I believe one of those was an internal announcement at Cummins that was publicly available on its website, and the other was a press release. But they don't give any benchmark to compare anything to, and there's no evidence any consumer ever saw one of them. The named plaintiffs, not a single one of them ever saw any of them. And as my co-counsel pointed out- It's on your public site. It is on the Cummins public website. So if some person dug down to find them, like a plaintiff's lawyer, they could eventually be found. But there's not a firm representation to benchmark a case against. There is no we are cleaner than this or we are cleaner than that. There is no representation of how much NOx comes out of the after-treatment system. And the plaintiffs acknowledge this because the only benchmark on which they rely are the federal regulations. In fact- Just one moment. Their expert stated that even though all of these strategies for emissions were approved, that the emissions were far in excess of the allowable Clean Air Act standards across real-world driving conditions, and that even though they were all approved, that the allegedly inadequate engine design produced levels of NOx far above the relevant emission standards. So even with what you just referred to, Your Honor, even plaintiff's expert is still relying on nothing but the regulations. If you strip out the regulations in this case, which you would have to do if this were overturned and sent down, their expert would have nothing to testify about. I mean, he could say, I tested and it emits this amount of NOx, but there'd be no comparison of what that is to. There's no evidence in the case comparing it to any other vehicle. There's no evidence comparing it to prior vehicles. There's no evidence comparing it to competitors. And certainly that could have been available because, as you noted, Your Honor, there's the Counts case, there's the Fenner case, there's this case, there's lots of trucks that have been tested. I think your time is up. Oh, I'm sorry. One last sentence. How about that? No. So I think at the end of the day, this case is factually distinguishable from Fenner, particularly as it relates to Cummins, Inc., the component parts supplier, not the seller of the vehicles. Thank you. Thank you. So I'll begin briefly with representation that Cummins did not make any statements or is not responsible for any statements to consumers that could have created expectations regarding vehicle cleanliness. First of all, I think that if you look at the district court made a finding about that in its summary judgment order. That's record 272 at page 15. I don't have the page ID number, but it was at page 15. So Cummins did make customers. It does advertise its equipment. It advertises its engines. And it makes statements about how clean and how powerful and how fuel efficient they are. And furthermore, I think that there's an issue of fact. FCA made many more representations, I will admit, than Cummins did. But many of those representations were talking about how great the Cummins engines were that they were putting into these trucks. And Mr. Sobel referred to how Cummins doesn't even share its technology with its partner, FCA. Cummins certainly knew that these trucks were being marketed on the strength of the reputation and its having built these engines. And we think that there are certainly circumstances under which Cummins might be given a duty to disclose, a duty to fully disclose in light of its knowledge. You're talking about a representation. You're talking about a sin of omission, not a sin of commission. Right. And that was actually. Best support for that. That brings me to my next point, because this is primarily an omissions case. This is a fraudulent omissions case. And I want to correct Mr. Donwhine in the way that he characterized Fenner. Fenner was not an explicit misrepresentation case. It was purely an omissions case. The court did refer to, and the case there refers to, some representations that General Motors made about the cleanliness of its vehicles. But that's in the context of giving rise to a duty to fully disclose, because those statements are misleading in light of the partial disclosure that was contained in them. So it's not an affirmative misrepresentation case. It's a failure to disclose case, just like this one. And let's see. I also wanted to point out the EPA does not certify vehicles as clean diesel. It provides certificates of conformity that permit vehicles to be sold in the United States. And significantly, those certificates of conformity don't permit any vehicle that's slapped with the proper label that matches the one on the certificate to be sold. The certificate only applies to vehicles that are built substantially as, they have to be material identical to the vehicle as it was disclosed to the EPA in the application. If the vehicle is different than what was certified, it's not covered by the COC, by the certificate of conformity. And that's 40 CFR 86.1848-10. And it explicitly says that a certificate of conformity only covers vehicles that are substantially identical to what was disclosed to the EPA. So it's not this carte blanche. One sentence. Your Honors, this case, I think that you can go to great lengths to try to distinguish this from Fenner. The essential claims are the same. We're talking about whether consumers could reasonably expect vehicles advertised as being clean to actually demonstrate those characteristics under normal operating circumstances. Thank you very much. It's a complex case, and we thank you all for your work on it, for the briefing and the supplemental briefing. It will be taken under advisement and an opinion issued in due course. The due course here may be a little longer because we have some pending motions.